UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

B&G EQUIPMENT COMPANY, INC.,

     Plaintiff,

v.                                                                              Case No: 8:19-cv-403-T-36AEP

AIROFOG USA, LLC,

     Defendant.

_____/

# O R D E R

This cause comes before the Court on Defendant's Motion for Partial Judgment on the Pleadings (the "Motion"), (Doc. 49), Plaintiff's response in opposition, (Doc. 52), Defendant's reply, (Doc. 55), and Plaintiff's sur-reply, (Doc. 58). The Court, having considered the parties' submissions and being fully advised in the premises, will deny the Motion.

## I.    BACKGROUND

### A.  Factual Background[1]

B&G Equipment Company, Inc. ("Plaintiff") manufactures and sells various pest control products to pest control specialists and the American public. (Doc. 1 ¶5). One of Plaintiff's most popular and longest-running products is a sprayer (the "B&G Sprayer"). *Id.* at ¶10. (internal quotation marks omitted). The B&G Sprayer rapidly became the corporate image and brand for Plaintiff, and continues to represent Plaintiff's corporate image and brand, following Plaintiff's introduction of the product in 1962. *Id.* at ¶11. Plaintiff owns two incontestable trademark registrations on the B&G Sprayer: (1) a trademark registration for the B&G Sprayer, including the

---

[1] The statement of facts is derived from the Complaint for Damages, Injunctive Relief and Demand for Jury Trial (the "Complaint"), (Doc. 1), the allegations of which the Court accepts as true in ruling on the Motion, *Perez v. Wells Fargo N.A.*, 774 F.3d 1329, 1335 (11th Cir. 2014).

words "B&G" stamped thereon; and (2) a trademark registration for the B&G Sprayer's body (collectively, the "Trademark Registrations"). *Id.* at ¶¶13–14. Plaintiff also owns common law trademark and trade dress rights for certain unique and ornamental features of the B&G Sprayer (the "B&G Sprayer Trade Dress"). *Id.* at ¶15. The following features constitute the B&G Sprayer Trade Dress:

> (1) a cylindrical barrel; (2) circumferential rings extending around the barrel; (3) a slightly conical top member for the barrel; (4) a handle configuration incorporation a tubular gripping portion and a semicircular support member connecting the gripping portion to a pump portion of the barrel; (5) a sprayer wand with an obtusely angled tip portion; and (6) a diagonal mounting pocket for the sprayer wand affixed to the barrel, which holds the sprayer wand generally upright when mounted to the barrel.

*Id.*

Plaintiff has continuously and actively marketed the B&G Sprayer with the B&G Sprayer Trade Dress in interstate commerce since the product's introduction, Plaintiff has enjoyed the goodwill associated with the B&G Sprayer Trade Dress, and customers within the pest control industry associate the B&G Sprayer Trade Dress exclusively with B&G. *Id.* at ¶¶18, 20–21.

Airofog USA, LLC ("Defendant") distributes pest control products, including sprayers, throughout the country. *Id.* at ¶¶7–8. Plaintiff and Defendant share the same trade channels for their products, have previously attended the same trade shows, and target the same end customers. *Id.* at ¶¶30–32. As early as October 2014, Defendant began selling a sprayer (the "AF Sprayer") that blatantly copied the B&G Sprayer's design. *Id.* at ¶22. The AF Sprayer includes the features shown in Plaintiff's two Trademark Registrations, except AF Sprayer's barrel displays the "Airofog" name instead of the "B&G" name. *Id.* at ¶28. The AF Sprayer also includes the elements of the B&G Sprayer Trade Dress. *Id.* at ¶29.

Consequently, Plaintiff sued Defendant in this Court for trademark infringement and unfair competition in 2016 (the "2016 Litigation"). *Id.* at ¶38. Plaintiff and Defendant subsequently entered into a written settlement agreement, dated November 15, 2017 (the "Settlement Agreement."). In accordance with the settlement between the parties, the Court dismissed the 2016 Litigation on December 5, 2017. *Id.* at ¶39. Pursuant to the Settlement Agreement, Defendant agreed to: (1) label the AF Sprayer with a vinyl, destructive "Made in China" label; (2) adjust the lengths of the AF Sprayer's wands to either 7.5 or 17.5 inches; (3) make certain parts of the AF Sprayer, including the wands, hose, trigger valve, and filter non-interchangeable with the B&G Sprayer; and (4) make no parts for the AF Sprayer that would be interchangeable with parts for the B&G Sprayer, except for a few parts irrelevant to this action. *Id.* at ¶¶ 42, 44, 46–48.

Following the parties' execution of the Settlement Agreement, Plaintiff learned that Defendant (1) utilizes "Made in China" labels that may be removed easily without causing destruction to the label; (2) uses wands for the AF Sprayer that are not exactly 7.5 inches or 17.5 inches; and (3) uses certain parts for the AF Sprayer that are interchangeable with the B&G Sprayer's parts. *Id.* at ¶50. These recent actions allegedly constitute material breaches of the Settlement Agreement. *Id.* at ¶¶49, 54. Although Plaintiff afforded Defendant an opportunity to cure the material breaches of the Settlement Agreement, Defendant failed to do so. *Id.* at ¶¶54–59. Defendant continues to advertise and sell the AF Sprayer while touting the interchangeability of the AF Sprayer's parts with the B&G Sprayer and the AF Sprayer's wand lengths in excess of 7.5 and 17.5 inches. *Id.* at ¶60.

### B. Procedural Posture

Plaintiff now brings several claims against Defendant, including claims for violations of the Lanham Act, 15 U.S.C. § 1051 *et seq.*, violation of the Florida Deceptive and Unfair Trade

Practices Act, Fla. Stat. § 501.201 *et seq.*, and breach of contract. *Id.* at ¶¶62–135. Defendant answers, asserts affirmative defenses, and counterclaims.[2] (Doc. 21). Plaintiff likewise answers and asserts affirmative defenses to Defendant's counterclaims. (Doc. 32). With the pleadings closed, Defendant moves for partial judgment on the pleadings, asking the Court to enter judgment in its favor on all of Plaintiff's claims, expect the breach of contract claim. (Doc. 49 at 3).

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 12(c) permits a party to move for judgment on the pleadings. Fed. R. Civ. P. 12(c). This rule provides "a means of disposing of cases when . . . a judgment on the merits can be achieved by focusing on the content of the competing pleadings . . . ." 5C Charles Alan Wright et al., *Federal Practice and Procedure* § 1367 (3d ed. 2004). In evaluating a motion for judgment on the pleadings, a court will accept the facts in the complaint as true and view them in the light most favorable to the nonmoving party. *See Cunningham v. Dist. Attorney's Office for Escambia Cnty.*, 592 F.3d 1237, 1255 (11th Cir. 2010). As such, "[a] motion for judgment on the pleadings is governed by the same standard as a motion to dismiss under Rule 12(b)(6)." *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345, 1350 (11th Cir. 2018) (internal quotation marks omitted). "Judgment on the pleadings is proper when no issues of material fact exist, and the moving party is entitled to judgment as a matter of law based on the substance of the pleadings and any judicially noticed facts." *Id.* (internal quotation marks omitted). If there is a material dispute of fact, judgment on the pleadings must be denied. *Perez*, 774 F.3d at 1335.

When resolving a motion for judgment on the pleadings, the Court must consider all of the pleadings: the complaint, the answer, and any documents attached as exhibits. *Eisenberg v. City*

---

[2] Defendant counterclaims for false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.* (Doc. 21 at 19–27).

*of Miami Beach*, 54 F. Supp. 3d 1312, 1319 (S.D. Fla. 2014). If "matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *but see*, *e.g.*, *Cunningham*, 592 F.3d at 1255 (taking judicial notice upon consideration of a motion for judgment on the pleadings without converting the motion to one for summary judgment). "A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes." Fed. R. Civ. P. 10(c).

## III. ANALYSIS

In moving for partial judgment on the pleadings, Defendant argues that the Court should enter judgment in its favor on every claim, except the allegations of the breach of contract claim pertaining to Defendant's actions occurring after November 15, 2017, because Plaintiff released these claims in the Settlement Agreement and covenanted that it would not sue Defendant on the same claims. (Doc. 49 at 3). For the reasons set forth below, the Motion is due to be denied.

### A. The Settlement Agreement

The analysis begins, as it must, with the language of the Settlement Agreement, a copy of which Plaintiff attaches to the Complaint. (Doc. 1-3). The Settlement Agreement provides that it must be governed by and construed in accordance with Georgia law, without regard to the conflict of laws principles thereunder. (Doc. 1-3 at 5). Both parties agree that the Settlement Agreement must be construed with reference to Georgia law. (Docs. 49 at 3; 52 at 9). Accordingly, the Court will construe the Settlement Agreement with reference to Georgia law.

Georgia law provides that a release or settlement agreement constitutes a contract that is subject to a court's construction. *Kobatake v. E.I. DuPont De Nemours & Co.*, 162 F.3d 619, 624

(11th Cir. 1998) (per curiam) (quoting *Darby v. Mathis*, 441 S.E.2d 905, 906 (Ga. Ct. App. 1994)). A settlement agreement therefore "must meet the same requirements of formation and enforceability as other contracts." *Lamb v. Fulton-DeKalb Hosp. Auth.*, 677 S.E.2d 328, 333 (Ga. Ct. App. 2009) (internal quotation marks omitted). The "cardinal rule" of contract construction is ascertaining the intention of the parties. Ga. Code. Ann. § 13-2-3; *Glazer v. Crescent Wallcoverings, Inc.*, 451 S.E.2d 509, 512 (Ga. Ct. App. 1994) ("As in any situation involving the construction of a contract, magic words are not required, and the goal of the court is to look for the intent of the parties."). "If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction." Ga. Code. Ann. § 13-2-3. "When a contract provides plainly that it was the intent of the parties to settle and effect a resolution of all claims and disputes of every kind and nature among them . . . that it is the entire agreement of the parties; and that they released and waived all claims against each other of any kind whether known or unknown . . . no grounds at law or in the contract exist to open it to jury examination." *Kobatake*, 162 F.3d at 625 (internal quotation marks and alterations omitted).

In the Settlement Agreement, Plaintiff and Defendant expressed their "desire to compromise and settle all of B&G's claims in the Litigation, as well as all other claims that could have been brought by [Defendant] in the Litigation" upon the Settlement Agreement's terms, covenants, and conditions.[3] (Doc. 1-3 at 1). As such, Plaintiff released certain types of claims against Defendant. Specifically, Section 2.1 of the Settlement Agreement (the "B&G Release") provides:

---

[3] The Settlement Agreement defines "Litigation" by simply referring to *B&G Equipment Co., Inc. v. Airofog USA, LLC,* Case No. 8:16-cv-3432-CEH-MAP." (Doc. 1-3 at 1).

> Except with respect to the obligations created by or arising out of this Agreement, B&G, and each of B&G's attorneys, representatives, agents, heirs, successors and assigns (collectively the "B&G Releasors") hereby releases, acquits and forever and absolutely discharges Airofog, and each of Airofog's employees, attorneys, representatives, agents, officers, directors, parents, subsidiaries, Affiliates and insurance carriers, past and present (collectively, the "Airofog Releasees") of and from any and all Claims,-that the B&G Releasors now have against the Airofog Releasees, including but not limited to any Claims, facts or allegations which were or could have been asserted in the Litigation, or which arise out of the facts, circumstances and allegations in the Litigation, and that existed prior to [November 15, 2017] (collectively, the "B&G Release").

*Id.* at 2 (original emphasis removed).[4]

Thus, except for those obligations created by or arising out of the Settlement Agreement, Plaintiff released Defendant of and from two types of claims: (1) claims that Plaintiff then had against Defendant, including, without limitation, any claims, facts, or allegations which were or could have been asserted in the 2016 Litigation, or which arise out of the facts, circumstances, and allegations in the 2016 Litigation; and (2) claims that existed prior to November 15, 2017. Significantly, the Settlement Agreement also states that the parties acknowledge and agree that the Settlement Agreement "fully and finally releases and forever resolves [Plaintiff's] Claims against [Defendant]" in the 2016 Litigation. *Id.*

Similarly, Plaintiff covenanted, among other things, not to make any claim or commence any lawsuit or cause of action which was brought or otherwise could have been brought in the 2016 Litigation, or which otherwise served as the subject of the B&G Release. *Id.* Specifically, Section 2.4 of the Settlement Agreement (the "Covenant Not to Sue") provides:

---

[4] The Settlement Agreement defines "Claims" as "any and all actual or possible claims, counterclaims, third-party claims, contribution claims, indemnity claims, demands, actions, liabilities, damages, losses, causes of action, obligations, losses and all actual or possible other claims of every kind and nature in law or equity, whether arising under state, federal, international or other law." (Doc. 1-3 at 2).

> B&G covenants that it will never make any claim or commence or prosecute against Airofog any suit, cause of action or alleged cause of action, claim or demand which was brought, or could have been brought, in the Litigation, or which is otherwise the subject of the B&G Release (the "B&G Covenant Not To Sue").

*Id.* (original emphasis removed).

Defendant also made certain representations, warranties, and covenants in the Settlement Agreement. Section 3.3 of the Settlement Agreement provides:

> In consideration of the B&G Release, and other good and valuable consideration, the receipt of which is hereby acknowledged, Airofog represents, warrants and covenants that:
>
> (a) The AF Sprayer, AF ADU, and AF Termite Tool (collectively the "Products") shall all be marked "Made In China" from the Effective Date forward for so long as such Products, or any component parts thereof, are actually made in China and such Products are sold in the United States of America. This marking requirement shall not apply to Products sold to customers outside the United States of America. The marking of the AF Sprayer shall be a sticker of ½" width and 1 ½" length with the wording taking up eighty percent (80%) or more of the sticker area, and the sticker shall be placed at a position on the lower portion of the tank which is clearly visible to consumers and which is not obstructed by any portions of the AF Sprayer. For the AF ADU and the AF Termite Tool, the sticker shall 3/8" width and 1 1/8"length with the wording taking up eighty percent (80%) or more of the sticker area and may be placed in any location that is easily visible to the purchaser. All stickers comprise vinyl, destructible labels, or some equivalent type of label which is tamper resistant, or which is made in such a manner so as not to be easily removable from the respective Products without destruction of the label itself. B&G agrees that the following types of labels are appropriate for use in connection with this sub-section: (i) Brady Defender™ destructible labels made by Brady (http://www.bradybrandprotection.com/), (ii) CAMCODE® destructible labels made by Horizons Inc. (https://www.camcode.com/), or (iii) NADCO® destructible vinyl labels [Material 7613] made by Nadco Tapes & Labels, Inc. ( http://www.nadco-inc.com/index.html). A "Made in China" label for the AF Sprayer shown on its location, which is compliant with this paragraph, is attached as Exhibit B.
>
> (b) Airofog will sell off no more than twenty-five (25) AF Sprayers of the current design after the Effective Date of this Agreement. All

other AF Sprayers sold by Airofog going forward shall be of the New Designs defined and agreed upon below, and Airofog shall not sell any AF Sprayers with the old design after thirty (30) days from the Effective Date of this Agreement. Additionally, Airofog represents and warrants that, as of the Effective Date, it has no more than twenty-five (25) units of each of the AF ADU and AF Termite Tool in inventory, and that it shall not sell any AF ADU or AF Termite Tool products of the old design after thirty (30) days from the Effective Date of this Agreement.

*Id.* (alterations in original).

Section 3.4 of the Settlement Agreement states further consideration for the B&G Release,

providing:

In further consideration of the B&G Release, and other good and valuable consideration, the receipt of which is hereby acknowledged, Airofog represents, warrants and covenants to make and maintain the following changes to the AF Sprayer, AF ADU and AF Termite Tool (collectively, the "New Designs"):

(a) The lengths of the wands for the AF Sprayer shall be only 7 ½ inches or 17 ½ inches, and shall not be interchangeable with wands for the current B&G Sprayer; The hose, trigger valve, and filter for the AF Sprayer shall not be interchangeable with the current B&G Sprayer; No parts for the AF Sprayer shall be interchangeable with the B&G Sprayer, except for the parts shown in Exhibit C attached hereto; The color of the hose for the AF Sprayer shall be blue; The base of the AF Sprayer shall be blue and the pocket in the base for holding the tip of the sprayer wand shall be more circular and deeper than the pocket in the B&G Sprayer, as shown in Exhibit D attached hereto; The pump handle of the AF Sprayer shall have the square configuration (but not the color) shown in Exhibit E attached hereto; The flat portion of the pump handle of the AF Sprayer shall include a colored sleeve; The pump cap of the AF Sprayer shall be approximately 2½ times the size of the pump cap on the B&G Sprayer (collectively, the "AF Sprayer New Design").

(b) The color of the hose and the clamp cap for the AF ADU shall be blue, as shown in Exhibit F attached hereto; The clamp for the AF ADU shall have a twist locking mechanism, as opposed to the push locking ring of the B&G ADU (collectively, the "AF ADU New Design"). *Id.* at 3–4.

(c) The color of the handle for the AF Termite Tool and the color of the foot ram for the AF Termite Tool shall be blue or black; the

> handle of the AF Termite Tool and the foot ram of the AF Termite
> Tool shall have the configurations shown in Exhibit G attached
> hereto and shall not interchangeable with the handle or the foot ram
> of the B&G TT400; The rods of the AF Termite Tool shall be quick
> connect, and not interchangeable with the rods currently used with
> the B&G TT400. The valve parts of the AF Termite Tool shall not
> be interchangeable with the valve parts of the B&G TT400
> (collectively, the "AF Termite Tool New Design").

*Id.* at 3–4.

The Settlement Agreement's merger clause also provides that the Settlement Agreement contains the entire agreement between Plaintiff and Defendant concerning the subject matter therein and supersedes and cancels all prior agreements, negotiations, and commitments regarding the Settlement Agreement's subject matter. *Id.* at 5. Finally, the Settlement Agreement contains a severability clause, which provides:

> The illegality, invalidity, or unenforceability of any provisions of
> this Agreement shall not operate to invalidate the whole Agreement
> and shall in no way affect the validity or enforceability of any other
> provisions of this Agreement and they will remain in full force and
> effect. If any provision of this Agreement is found by a court of
> competent jurisdiction to be invalid or unenforceable the affected
> provision shall be modified to the minimum extent necessary to be
> valid and enforceable and shall be enforced as modified.

*Id.* at 5.

Neither Defendant nor Plaintiff challenge the Settlement Agreement's formation or the intent of the parties.[5] Nor do the parties challenge the Settlement Agreement's terms as ambiguous. Instead, the parties set their focus on, among other arguments, whether issues of material fact exist, whether Defendant provided sufficient consideration for the release provisions, and whether

---

[5] As addressed below, Plaintiff concisely asserts in a footnote, without further explanation, that any argument that the B&G Release and the Covenant Not to Sue are not "inexorably linked" is contrary to the "clear intent of the parties." (Doc. 52 at 7 n.4).

Plaintiff may now refuse to perform its obligations under the Settlement Agreement. (Docs. 49, 52, 55, 58).

## B. 2016 Litigation

Having reviewed the pertinent language of the Settlement Agreement, the Court must determine whether the Settlement Agreement bars Counts I through VI in the present action. In arguing that B&G previously released the claims that it now asserts in Counts I through VI of the Complaint, Defendant asserts that Plaintiff "unquestionably" now lodges the same claims against Defendant as the 2016 Litigation. (Doc. 49 at 4). As the language above indicates, Plaintiff released and forever discharged Defendant from two types of claims: (1) claims that Plaintiff then had against Defendant, including but not limited to, any claims that were or could have been asserted in the 2016 Litigation, or which arise out of the facts, circumstances, and allegations in the 2016 Litigation; and (2) claims that existed prior to November 15, 2017. Similarly, Plaintiff covenanted never to make any claim or commence against Defendant any lawsuit, cause of action, or alleged cause of action that was brought, or could have been brought, in the 2016 Litigation, or was the subject of the B&G Release. Therefore, understanding the 2016 Litigation is paramount to understanding the scope of the B&G Release and Covenant Not to Sue. To facilitate this understanding, the Court looks to the pleadings and the complaint filed in the 2016 Litigation.

### i. Pleadings

As the scope of the Court's review on a motion for judgment on the pleadings is confined to the pleadings and any judicially noticed facts, the Court examines the pleadings to ascertain the nature of the 2016 Litigation. In the Complaint, Plaintiff vaguely alleges that it brought "claims against Defendant" in this Court in 2016 "for, *inter alia*, trademark infringement and unfair competition." (Doc. 1 ¶38). Plaintiff also alleges that the Court dismissed the 2016 Litigation,

pursuant to the Settlement Agreement. *Id.* at ¶39. The instant complaint thus does not describe in detail the nature of the 2016 Litigation. In its Answer, Defendant admits that Plaintiff filed a lawsuit against it on December 16, 2016, which asserted claims for trademark infringement and unfair competition. (Doc. 21 ¶38). Defendant similarly admits that the Court dismissed the 2016 Litigation, pursuant to the Settlement Agreement. *Id.* at ¶39.

The Settlement Agreement, similarly addresses the 2016 Litigation only vaguely. The Settlement Agreement states that the 2016 Litigation involved claims by Plaintiff that certain products sold by Defendant—among others, "such products comprising the AF Sprayer"—infringed certain intellectual property rights of Plaintiff. (Doc. 1-3 at 1). The Settlement Agreement also states that Plaintiff alleged in the 2016 Litigation that specific designs of the AF Sprayer caused a likelihood of confusion with respect to certain products manufactured and sold by Plaintiff. *Id.* And the Settlement Agreement reflects the desire of Plaintiff and Defendant "to compromise and settle all of [Plaintiff's] claims in the [2016] Litigation," as well as claims that Defendant could have brought in the 2016 Litigation. *Id.* Thus, the pleadings only vaguely describe the 2016 Litigation.

## ii. *Judicial Notice of the 2016 Complaint*

The scope of the Court's review also includes any judicially noticed facts. Examining Plaintiff's then-operative, amended complaint from the 2016 Litigation (the "2016 Complaint") requires the Court to look beyond the pleadings, which Defendant impliedly requests the Court to do. The Federal Rules of Evidence allow the Court to take judicial notice on its own. Fed. R. Evid. 201(c). The Court takes judicial notice only of the fact that Plaintiff advanced the 2016 Complaint's allegations in the 2016 Litigation, not the truth or accuracy of those allegations or any matters asserted in the 2016 Litigation, nor does the Court take judicial notice to impose into the

Complaint the allegations from the 2016 Complaint. *See Verizon Trademark Servs., LLC v. Producers, Inc.*, No. 8:10-cv-665-T-33EAJ, 2011 WL 308237, at *1 (M.D. Fla. Jan. 27, 2011) (Covington, J.) (taking judicial notice only of the fact that the plaintiff had advanced allegations in a complaint in another action); *cf. Jones*, 29 F.3d at 1553 (describing the basis for indisputability serving as a prerequisite for a fact to be judicially noticed). Plaintiff does not object to, or otherwise challenge, Defendant's request for the Court to view the 2016 Complaint in arguing that Counts I through VI are the same as certain claims in the 2016 Litigation.[6] The Court's judicial notice of the fact that Plaintiff advanced certain allegations in the 2016 Litigation does not require the Court to convert the Motion into a motion for summary judgment.[7]

Plaintiff alleged in the 2016 Complaint that Defendant was promoting, selling, and offering for sale certain goods that were confusingly similar imitations of Plaintiff's trademarked goods. *B&G Equip. Co., Inc. v. Airofog USA*, No. 8:16-cv-3432-T-36MAP (M.D. Fla.) (Doc. 22 at 1). Plaintiff identified three products of which Defendant allegedly had confusingly similar imitations: the B&G Sprayer, the Aerosol Delivery Unit (the "ADU"), and the Series 400 Termite Tool (the "TT 400"). *Id.* at ¶¶39–64. For the B&G Sprayer, Plaintiff alleged that the AF Sprayer constituted

---

[6] Plaintiff argues in passing that Defendant filed the Motion as a "Motion for Partial Summary Judgment on the Pleadings," and, to the extent that Defendant seeks summary judgment, such relief is premature because "the record is not fully developed" and "discovery is active and ongoing." (Doc. 52 at 1 n1.). However, even a quick review of the Motion reveals that Defendant does not title the Motion as one for partial summary judgment, nor does Defendant request partial summary judgment.

[7] Defendant further contends that Counts I through VI are the same as Plaintiff's claims in the 2016 Litigation because Plaintiff's counsel represented to the Court during the preliminary injunction hearing in this action that Plaintiff's trademark rights were asserted in the 2016 Litigation. (Doc. 49 at 5). This argument also requires the Court to look outside the pleadings. The Court declines to take judicial notice of the selected statements within the transcript from the March 26, 2019 preliminary injunction hearing for the truth of the matters asserted. *See Zurich Am. Ins. Co.*, 314 F. Supp. 3d at 1300.

a substantially similar product, included the features described in the Trademark Registrations (except the word "B&G" on the barrel), and includes the elements of the B&G Sprayer Trade Dress. *Id.* at ¶¶43, 45–46. Plaintiff alleged that Defendant was infringing, and would continue to infringe, B&G's intellectual property rights in the Trademark Registrations, the B&G Sprayer Trade Dress, the trade dress of the ADU, and the trade dress of the TT 400, which Plaintiff collectively referred to as the "B&G Trade Dress." *Id.* at ¶60.

Plaintiff accordingly brought six claims against Defendant: (i) a claim for trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. § 1114; (ii) a claim for unfair competition by false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (iii) a claim for unfair competition under Florida common law; (iv) a claim for violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*; (v) a claim for unjust enrichment; (vi) and a claim for unfair competition by false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). *Id.* at ¶¶65–126. Each of these claims generally relied upon allegations pertaining to the B&G Sprayer, either directly or by reference to the "B&G Trade Dress," or the AF Sprayer. *E.g.*, *id.* at ¶¶68, 83, 94, 104, 109, 113.

### C. B&G Release and Covenant Not to Sue

Having determined the nature of the 2016 Litigation to ascertain the scope of the B&G Release and the Covenant Not to Sue, the Court now examines whether Counts I through VI fall within the scope of those provisions. The Court addresses Counts I through V and Count VI separately. For the reasons set forth below, Counts I through V arise out of the facts, circumstances and allegations in the 2016 Litigation, but the Court declines to enter judgment for Defendant on those claims at this time. Further, the Court declines to enter judgment for Defendant on Count VI,

as that claim relies on factual allegations regarding acts or omissions that allegedly occurred subsequent to the 2016 Litigation.

### i.  Counts I through V

Preliminarily, under Georgia law, "a release by the other contracting party shall be a complete defense." Ga. Code. Ann. § 13-5-7. Indeed, "Georgia law allows a party to release another from liability for future conduct and unknown claims, provided such intent is clearly expressed in the release." *Dennis v. City of Atlanta*, 751 S.E.2d 469, 472 (Ga. Ct. App. 2013). "In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense . . . ." Fed. R. Civ. P. 8(c)(1). Here, Defendant's fifth affirmative defense asserts that the B&G Release bars Counts I through V—omitting Count VI—because Plaintiff could have asserted these claims in the 2016 Litigation or these claims arise out of the facts, circumstances, and allegations in the 2016 Litigation. (Doc. 21 at 14–15). Defendant therefore raised the B&G Release as an affirmative defense as to Counts I through V.

Like the 2016 Complaint, Plaintiff details the history of the B&G Sprayer, as well as the Trademark Registrations and the relevant trade dress. (Doc. 1 ¶¶9–21). Also like the 2016 Complaint, Plaintiff alleges that Defendant began selling the AF Sprayer—the design of which "blatantly copied" the B&G Sprayer's design—as early as October of 2014, that the AF Sprayer includes all of the features shown in the Trademark Registration (except displaying "B&G" on the barrel), and that the AF Sprayer includes the elements of the B&G Sprayer Trade Dress. *Id.* at ¶¶22, 28–29. Thus, Plaintiff similarly alleges that the AF Sprayer infringes on Plaintiff's intellectual property rights.

Further, Counts I through V present the same legal theories, in the same order, as Counts I through V in the 2016 Complaint: trademark infringement under Section 32 of the Lanham Act,

15 U.S.C. § 1114; unfair competition by false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); unfair competition under Florida common law; violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201 *et seq.*; unjust enrichment; and unfair competition by false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). *Id.* at ¶¶62–106. Each of these claims also is predicated upon allegations pertaining to the B&G Sprayer, either directly or by reference to the B&G Sprayer Trade Dress, or the AF Sprayer. *E.g.*, *id.* at ¶¶65, 78, 89, 99, 104, 109. Thus, although Counts I through V do not reference the ADU or the TT400, these counts are again based on Defendant's alleged use of the designs of the Trademark Registrations or the B&G Sprayer Trade Dress for the AF Sprayer, for which Plaintiff similarly sought relief in the 2016 Complaint. Counts I through V do not include any new factual allegations regarding the AF Sprayer.

These allegations collectively reveal that Plaintiff brings its present claims against Defendant because Defendant allegedly breached the Settlement Agreement. In other words, Plaintiff contends that Defendant's purported infringement continues due to Defendant's alleged material breaches of the Settlement Agreement. Indeed, although the Complaint broadly alleges that Plaintiff initiated this action "[t]o protect its trademarks and other valuable intellectual property *from further infringement* by Defendant, and to seek relief for the ongoing irreparable harm caused by Defendant," Counts I through V do not identify any acts or omissions following the parties' entry into the Settlement Agreement or the subsequent, alleged breaches. *Id.* at ¶61 (emphasis added). This is in stark contrast with Count VI. Even when accepting Plaintiff's allegations as true and viewing the allegations in the light most favorable to Plaintiff, Counts I through V appear to arise out of the facts, circumstances, and allegations in the 2016 Litigation. Nonetheless, as explained below, the declines to enter judgment on Counts I through V.

The same analysis applies for the Covenant Not to Sue with respect to Counts I through V.[8] In the Covenant Not to Sue, Plaintiff covenanted, among other things, that it would not make any claim or commence any lawsuit, cause of action, or claim that was brought, or could have been brought, in the 2016 Litigation. (Doc. 1-3 at 2). Additionally, Plaintiff covenanted not to make any claim or commence any lawsuit, cause of action, or claim that otherwise is the subject of the B&G Release. *Id.* As discussed above, Plaintiff's release and discharge of two broad categories of claims serves as the subject of the B&G Release, including claims that Plaintiff then had against Defendant, which also encompasses those claims that arise out of the facts, circumstances, and allegations in the 2016 Litigation. *Id.* Because Counts I through V arise out of the facts, circumstances, and allegations in the 2016 Litigation, Counts I through V also serve as the subject of the B&G Release. Thus, the Covenant Not to Sue appears to cover Counts I through V. However, the Court will not enter judgment on these claims.

   ii. *Count VI*

Defendant also argues that the Settlement Agreement bars Count VI. (Doc. 49 at 4). In Count VI, Plaintiff brings a claim for unfair competition by false advertising under Section 43(a)

---

[8] Defendant asserts in the fifth affirmative defense that the B&G Release bars Counts I through V, but does not address the Covenant Not to Sue, nor does any other affirmative defense advanced by Defendant pertain to the Covenant Not to Sue. (Doc. 21 at 13–19). A party responding to a pleading "must affirmatively state *any* avoidance or affirmative defense." Fed. R. Civ. P. 8(c). However, "a defendant does not waive any affirmative defense if the earlier omission from responsive pleadings does not prejudice the plaintiff." *Edwards v. Fulton Cnty., Ga.*, 509 F. App'x 882, 887–88 (11th Cir. 2013) (per curiam) (finding that the district court did not abuse its discretion in rejecting the plaintiff's argument that the defendants prejudiced the plaintiff and waived an affirmative defense when the defendants raised the defense at the summary judgment stage following discovery that focused on the defense's subject matter). Notwithstanding this omission, and in light of the Court's denial of the Motion, the Court proceeds with the analysis of whether the Covenant Not to Sue bars the subject claims.

of the Lanham Act, 15 U.S.C. § 1125(a), against Defendant.[9] (Doc. 101 ¶¶107–121). Plaintiff alleges that, through its use and display of the AF Sprayer, Defendant "use[s] false and/or misleading descriptions and/or representations of fact in commercial advertising or promotion which misrepresent the nature, characteristics, and/or qualities of . . . its goods and/or services . . . ." *Id.* at ¶108. In support, Plaintiff alleges that Defendant manufactures the AF Sprayer in China and imports the product into the United States without marking the country of origin on the product or the packaging in a manner to ensure that the end customer knows this information. *Id.* at ¶110. However, unlike the 2016 Complaint and Counts I through V of the Complaint, Plaintiff also relies on Defendant's subsequent efforts to apply a "Made in China" label to the AF Sprayer per the terms of the Settlement Agreement. Plaintiff alleges that the "Made in China" labels that Defendant has applied to some versions of the AF Sprayer are "cheap and easily removable." *Id.* Plaintiff further contends that the end customer will not know the true source of these AF Sprayers once such labels are removed. *Id.* at ¶111. Plaintiff alleges that this "conduct is deceptive and a misleading representation of fact that misrepresents the geographic origin" of the AF Sprayer in violation of 15 U.S.C. § 1125. *Id.* at ¶112. Thus, Plaintiff relies upon factual allegations subsequent to the parties' execution of the Settlement Agreement in bringing Count VI.

---

[9] Section 43(a) provides, in relevant:

> Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the nature, characteristics, qualifies, or geographic origin of his or her or another person's goods, services, or commercial activities, shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).

In addition to relying on these allegations regarding the "Made in China" labels, Plaintiff alleges that "Defendant utilizes the term 'USA' in its logo, with a red/white/blue color scheme," which Defendant purportedly utilizes to mislead the American public into believing that AF Sprayer possesses "certain qualities that it does not actually have." *Id.* at ¶113. Plaintiff included this factual allegation as support for its claim for unfair competition by false advertising in the 2016 Complaint. *B&G Equip. Co., Inc. v. Airofog USA*, No. 8:16-cv-3432-T-36MAP (M.D. Fla.) (Doc. 22 ¶115) Plaintiff again alleges that Defendant's purported use of the "USA" logo with the accompanying color scheme constitutes a misleading representation of fact in violation of 15 U.S.C. § 1125. (Doc. 1 ¶113).

Therefore, in accepting Plaintiff's allegations as true and viewing the allegations in the light most favorable to Plaintiff, Count VI relies on new factual allegations regarding actions or omissions that allegedly occurred subsequent to the 2016 Litigation—specifically, Defendant's application of the "Made in China" labels—in addition to some of the same factual allegations as Count VI of the 2016 Complaint. Because Plaintiff clearly relies on these above-mentioned actions or omissions subsequent to the 2016 Litigation to assert this unfair competition by false advertising claim, the Court declines to enter judgment for Defendant on Count VI. To the extent that Count VI is premised upon facts or allegations that were asserted in the 2016 Litigation or arises out of facts, circumstances, and allegations in the 2016 Litigation, or if Count VI otherwise constitutes a claim that was brought or could have been brought in the 2016 Litigation, the claim is subject to the above analysis for Counts I through V, and the Court will deny the motion as explained below.[10]

---

[10] The Court reiterates that Defendant's fifth affirmative defense asserts that the B&G Release bars Counts I through V of the Complaint, not Count VI. (Doc. 21 at 14–15). Defendant also asserts therein that the Court dismissed the claims in the 2016 Litigation with prejudice. *Id.* The Court is

**D. Breach of Contract Claim**

Ultimately, the Court declines to enter judgment for Defendant on Counts I through V at this stage of the litigation because the breach of contract claim implicates Plaintiff's ability to rely on the terms of the Settlement Agreement, which in turn implicates whether the Court may enter judgment on the pleadings. In the Complaint, Plaintiff alleges that Defendant has failed to adhere to its promises in the Settlement Agreement. (Doc. 1 ¶49). Specifically, according to Plaintiff, Defendant breached the Settlement Agreement in three ways: (1) using certain "Made in China" labels that are easily removable from without destroying the label; (2) using wands for the AF Sprayer which are not exactly 7.5 inches or 17.5 inches; and (3) using certain parts for the AF Sprayer that are interchangeable with parts for the B&G Sprayer. *Id.* at ¶50. Plaintiff accordingly contends in its breach of contract claim that Defendant has "breached multiple material obligations under the Settlement Agreement." [11] *Id.* at ¶127. Defendant denies these allegations. (Doc. 21 ¶¶49–50, 127). As Plaintiff correctly points out in its response to the Motion, a material dispute of fact exists as to whether Defendant breached the Settlement Agreement. (Doc. 52 at 7) ("While [Defendant] denies breaching those obligations, such divergence in the parties' allegations and arguments underscores that issues of material fact exist.").

---

cognizant that Paragraph 3.2 of the Settlement Agreement provides that Plaintiff must dismiss the 2016 Litigation with prejudice. (Doc. 1-3 at 3). While the Court declines to take judicial notice of any prior order from the 2016 Litigation at this time, Defendant may renew this argument and supply the requisite evidence on summary judgment.

[11] Plaintiff brings this breach of contract action notwithstanding the parties' representation in the Settlement Agreement that measuring and calculating the damages from "any breach of the covenants, representations or warranties" therein would be "impossible" or "inadequate." (Doc. 1-3 at 6). The Georgia Court of Appeals has recognized that "[t]he proper remedy for breach of a settlement agreement is an action for breach of contract, which under proper circumstances may include a claim for specific performance." *Hearn v. Dollar Rent A Car*, 726 S.E.2d 661, 669 (Ga. Ct. App. 2012).

An evaluation of Plaintiff's breach of contract claim necessarily involves an examination of whether Defendant breached the contract. *See Kuritzky v. Emory Univ.*, 669 S.E.2d 179, 181 (Ga. Ct. App. 2008) ("The elements for a breach of contract claim in Georgia are the (1) breach and the (2) resultant damages (3) to the party who has the right to complaint about the contract being broken."). Given Plaintiff's allegations, the Court will also need to determine whether the breaches constitute material breaches. Under Georgia law,

> A breach is material when it is so substantial and fundamental as to defeat the object of the contract. In other words, to trigger the right to rescission, the act failed to be performed must go to the root of the contract. A breach which is incidental and subordinate to the main purpose of the contract does not warrant termination.

*Vidalia Outdoor Prods., Inc. v. Higgins*, 701 S.E.2d 217, 219 (Ga. Ct. App. 2010) (quoting *Forsyth Cnty. v. Waterscape Servs., LLC*, 694 S.E.2d 102, 111–112 (Ga. Ct. App. 2010)).

"A material breach will excuse the non-breaching party from its duty of performance." *Clower v. Orthalliance, Inc.*, 337 F. Supp. 2d 1322, 1333 (N.D. Ga. 2004). Indeed, "[a]t the point of breach, a party may continue the contract or refuse to perform." *Id.* at 1331. If the breach constitutes a material breach, the non-breaching party must choose from one of two inconsistent rights: he or she may either (1) "allege a total breach, terminate the contract and bring suit" or (2) "honor the contract, declare the default only a partial breach, and recover those damages caused by that partial breach." *Id.* "When a party knows a contract has been breached and continues to perform or accept performance under the contract, that party can be said to have made an election." *Id.*

Defendant argues in the Motion that, even if it breached the Settlement Agreement, Plaintiff waived its right to refuse to perform the B&G Release. (Doc. 49 at 11). In support, Defendant argues that, following the alleged material breach, Plaintiff had a choice of either alleging a total breach, terminating the Settlement Agreement, and filing suit, or honoring the

Settlement Agreement, declaring the default only a partial breach, and recovering those damages caused by the partial breach. *Id.* at 12. Defendant argues that Plaintiff did not allege a total breach of the Settlement Agreement, did not allege that it terminated the Settlement Agreement, and does not request the Court to terminate the Settlement Agreement. *Id.* Defendant claims that Plaintiff instead relies on the Settlement Agreement. *Id.* Defendant accordingly asserts that Plaintiff forfeited its right to cease performing its covenants in the B&G Release. *Id.* at 11.

This argument invites the Court to assume that Defendant materially breached the Settlement Agreement in order to find that Plaintiff waived its right to refuse to perform the B&G Release. The danger in this assumption, of course, is that it may lead to a scenario in which the Court finds that Plaintiff waived any right to excuse its performance of the B&G Release in the absence of a material breach by Defendant. However, if Defendant did not materially breach the Settlement Agreement, then Plaintiff was not required to make an election and waiver is not implicated. As such, Plaintiff's ability to rely on the terms of the Settlement Agreement is tied to the breach of contract claim. And, as set forth above, Defendant does not move for judgment on the pleadings on all allegations in the breach of contract claim. Even if Defendant did seek judgment on the pleadings on that claim, the parties' pleadings evidence the existence of a material dispute of fact regarding whether Defendant breached the Settlement Agreement. Therefore, the Court declines to enter judgment on the pleadings on Counts I through V and Count VI, as it relates to Plaintiff's actions occurring before November 15, 2017.

### E. Consideration and Severability

Defendant further asserts that Plaintiff received sufficient consideration for the B&G Release and the Covenant Not to Sue, (Doc. 49 at 6–8), but Plaintiff challenges the consideration that it allegedly received in return for the "release provisions." (Doc. 52 at 9). For the reasons

stated below, the Court finds that sufficient consideration exists for the B&G Release and the Covenant Not to Sue.

Under Georgia law, a valid contract must contain "a consideration moving to the contract." Ga. Code. Ann. § 13-3-1. "To constitute consideration, a performance or a return promise must be bargained for by the parties to a contract." *Id.* § 13-3-42(a). "A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise." *Id.* § 13-3-42(b). "If the requirement of consideration is met, there is no additional requirement of a gain, advantage, or benefit to the promisor or of a loss, disadvantage, or detriment to the promisee." *Id.* § 13-3-43. Significantly, "[m]ere inadequacy of consideration alone will not void a contract. If the inadequacy is great, it is a strong circumstance to evidence fraud; and, in an action for damages for breach of a contract, the inadequacy of consideration will enter as an element in estimating the damages." *Id.* § 13-3-46.

Thus, "*any* benefit accruing to him who makes the promise, or *any* loss, trouble, or disadvantage undergone by or change imposed upon him to whom it is made qualifies as consideration." *NAFRA Worldwide, LLC v. Home Depot U.S.A., Inc.*, No. 1:12-cv-2808-AT, 2013 WL 12098772, at *4 (N.D. Ga. Aug. 29, 2013) (emphasis added) (quoting *Antoskow & Assocs., LLC v. Gregory*, 629 S.E.2d 1, 14 (Ga. Ct. App. 2005)) (internal quotation marks omitted). Indeed, "[s]light consideration suffices." *Id.* (citing *Franklin v. UAP/GA. AG. CHEM, Inc.*, 514 S.E.2d 241, 243 (Ga. Ct. App. 1999)); *see Speed v. Muhanna*, 619 S.E.2d 324, 330 (Gt. Ct. App. 2005) ("Insofar as consideration is concerned, a release is a surrender of a cause of action which may be gratuitous or given for inadequate consideration.") (internal quotation marks omitted).

Defendant argues in the Motion that it made numerous changes to products, at a substantial cost, in exchange for the B&G Release and the Covenant Not to Sue. (Doc. 49 at 6). Additionally,

Defendant argues that Plaintiff did not give the Covenant Not to Sue in "direct consideration" for Defendant's performance under Paragraphs 3.3 and 3.4 of the Settlement Agreement, unlike the B&G Release. *Id.* at 13. However, Plaintiff argues that, taking its allegations as true, the "release provisions" must be modified or severed from the Settlement Agreement in accordance with the severability clause because Defendant did not provide "full consideration" for such provisions, as evidenced by its alleged breach. (Doc. 52 at 9). Plaintiff contends the B&G Release and Covenant Not to Sue are linked, *id.* at 7 n.4, and simply states in its sur-reply that the B&G Release and the Covenant Not to Sue are tied to Defendant's performance, (Doc. 58 at 2).

The Settlement Agreement provides that the parties agree as stated therein "for and in consideration of the premises and covenants herein contained and other good and valuable consideration." (Doc. 1-3 at 1). Defendant's representations, warranties, and covenants in Paragraphs 3.3 and 3.4 of the Settlement Agreement, such as altering the length of the AF Sprayer wands to 7.5 or 17.5 inches, were made "[i]n consideration of the B&G Release, and other good and valuable consideration, the receipt of which is . . . acknowledged . . . ." (Doc. 1-3 at 3). The Settlement Agreement's severability clause provides that, if a court of competent jurisdiction finds any provision of the Settlement Agreement to be invalid or unenforceable, the affected provision must be "modified to the minimum extent necessary to be valid and enforceable and shall be enforced as modified." *Id.* at 5. Focusing first on the B&G Release, the Court is unpersuaded that it should use the severability clause to sever or modify the B&G Release as a result of insufficient consideration. In the B&G Release, Plaintiff promised to forego certain claims against Defendant, and, in exchange, Defendant promised to make and maintain changes to certain products, including not only the AF Sprayer, but also the AF ADU and the AF Termite Tool. *Id.* at 3–4. Some of those changes include altering the color of the hose and the clamp cap for the AF ADU to be blue and

altering the color of the AF Termite Tool and its foot ram to be blue or black. Defendant also promised that the AF Sprayer, the AF ADU, and the AF Termite Tool would be marked with "Made in China" labels—as long as those products were made in China and sold in the United States—meeting certain specifications. *Id.* And now Plaintiff sues for Defendant's alleged failure to perform *some* of these obligations—namely, obligations specific to only the AF Sprayer. Thus, Plaintiff did not receive insufficient consideration.

Likewise, for the Covenant Not to Sue, the Court is unpersuaded that Plaintiff did not provide sufficient consideration for the Covenant Not to Sue. The Settlement Agreement clearly states the parties' desire to settle all of Plaintiff's claims in the 2016 Litigation. (Doc. 1-3 at 1). Although Defendant's obligations in Paragraphs 3.3 and 3.4 are not explicitly tied to the B&G Release, each paragraph states that Defendant makes such representations, warranties, and covenants therein for "other good and valuable consideration, the receipt of which is . . . acknowledged." *Id.* at 3. Further, the parties agreed to the terms of the Settlement Agreement "for and in consideration of the premises and covenants herein contained and other good and valuable consideration." *Id.* at 1. Georgia law clearly states that "*any* benefit accruing to him who makes the promise, or *any* loss, trouble, or disadvantage undergone by or change imposed upon him to whom it is made qualifies as consideration." *NAFRA Worldwide*, 2013 WL 12098772, at *4 (emphasis added). Thus, the argument that Defendant's representations, warranties, and covenants in Paragraphs 3.3 and 3.4 were made in consideration solely for the B&G Release is unavailing.

This conclusion is further compelled by Plaintiff's failure to attack the sufficiency of consideration provided for the Covenant Not to Sue. Instead, Plaintiff tersely asserts in a footnote that the Covenant Not to Sue and the B&G Release are "inexorably linked" and "[a]ny argument to the contrary is against the clear intent of the parties, and directly at odds with principles of equity

and fairness." (Doc. 52 at 7 n.4). However, this assertion is unaccompanied by any persuasive argument. Presumably, Plaintiff emphasizes an "inexorable" connection between the two provisions so that the provisions may rise and fall together. As a consequence of this argument, Plaintiff focuses entirely on the sufficiency of the received consideration for the B&G Release, highlighting that Paragraphs 3.3 and 3.4 state that they are provided in consideration of the B&G Release. (Doc. 52 at 7, 10). But, even if the provisions are linked, the Court is satisfied that Plaintiff received sufficient consideration. Accordingly, sufficient consideration exists for the B&G Release and the Covenant Not to Sue.

### F. Restoration of Consideration and Rescission

Finally, the Court will address Defendant's arguments regarding restoration of consideration and rescission. These arguments are unavailing.

Turning first to Defendant's argument regarding restoring consideration, Defendant briefly argues that Plaintiff could not, and cannot, sue Defendant for the released claims without restoring the consideration that Defendant provided for the B&G Release. (Doc. 49 at 9). Defendant additionally contends that restoring any consideration would be impossible for Plaintiff because Plaintiff "cannot go back in time and cause [Defendant] to not make the numerous changes" to three different product lines. *Id.* at 10. In the Settlement Agreement, Defendant made several representations, warranties, and covenants in consideration of the B&G Release, as well as other good and valuable consideration, which are described over the course of several paragraphs. (Doc. 1-3 at 3–4). Among other consideration, Defendant represented, warranted, and covenanted that: (1) the AF Sprayer, the AF ADU, and the AF Termite Tool would be marked "Made in China" from November 15, 2017 forward, as long as these products, or any of their components, were made in China and the products were sold in the United States; (2) Defendant would sell no more

than twenty-five AF Sprayers of the design existing as of November 15, 2017; (3) the lengths of the wands for the AF Sprayer must be only 7.5 inches or 17.5 inches, and must not be interchangeable with wands for the B&G Sprayer. *Id.*

In *Leathers v. Robert Potamkin Cadillac Corporation*, the Georgia Court of Appeals recognized that "[i]t is well established that one who, for a valuable consideration, including payment of money, has released another from all further liability, cannot obtain a rescission of such a contract of release, and recover on the original cause of action, without first restoring or offering to restore what the releasee paid for such release." 361 S.E.2d 845, 846 (Ga. Ct. App. 1987). Citing to only *Leathers*, Defendant argues that Plaintiff was not, and is not, entitled to retain the valuable consideration it received from Defendant and also sue Defendant for the original claims. (Doc. 49 at 9). In *Leathers*, the plaintiff executed an agreement with the defendant to purchase an automobile. 361 S.E.2d at 845. In consideration of this agreement, the plaintiff executed a release, which absolved the defendant from "all claims, actions, liabilities of whatever nature from the beginning of time up to the present and specifically with reference to any claims, actions or liabilities in connection with" the purchased automobile. *Id.* at 845–46. After discovering that the automobile had been damaged prior to delivery, the plaintiff negotiated with both the defendant and the Cadillac Motor Division of General Motors, which resulted in him settling the claim with Cadillac for $1,000 and executing another release in favor of Cadillac. *Id.* at 846. The plaintiff subsequently wrote to the defendant, purporting to rescind his purchase of the automobile. *Id.* However, the plaintiff never returned, or offered to return, the automobile, he continued to drive the automobile, and he refused an offer from Cadillac to repurchase the automobile for the purchase price. *Id.* The plaintiff sued the defendant for fraud and violation of a state statute regulating tampering with odometers. *Id.* at 845.

The Georgia Court of Appeals rejected the plaintiff's argument that the release was ineffective. *Id.* The court explained that "in order to *rescind* a contract and sue for *restitution*, a plaintiff first must restore or make a bona fide effort to restore to the other party whatever benefits he has received from the transaction." *Id.* (emphasis added) (internal citation omitted). The court then highlighted that a party who releases another party from all further liability, for valuable consideration, cannot obtain a rescission of such contract of release and recover on the original cause of action without first restoring or offering to restore the payment of the releasee for such release. *Id.* (citing *Harley v. Riverside Mills*, 58 S.E. 711 (Ga. 1907)). The court noted that the plaintiff had not claimed that he was fraudulently induced into signing either of the releases. Further, the plaintiff had retained the automobile, continued to utilize the automobile, and twice knowingly signed releases of his claims in exchange for substantial monetary consideration. *Id.* at 847.

Here, unlike the plaintiff in *Leathers*, Plaintiff does not allege fraud or seek to rescind the Settlement Agreement or the B&G Release. Instead, Plaintiff *relies* on the Settlement Agreement to assert its breach of contract claim. *E.g.*, (Doc. 1 ¶¶123–127, 133–134). Additionally, the law relied upon by Defendant arises in the fraud context. Georgia law provides that "[a] contract may be rescinded at the instance of the party *defrauded*; but, in order to rescind, the defrauded party must promptly, upon discovery of the *fraud*, restore or offer to restore the other party whatever he has received by virtue of the contract if it is of any value." Ga. Code Ann. § 13-4-60 (emphasis added). For this reason, as the *Leathers* court recognized, a party seeking to rescind a contract and sue for restitution must restore, or make a bona fide effort to restore, whatever benefits he received from the transaction. *Daly v. Mueller*, 630 S.E.2d 799, 801 (Ga. Ct. App. 2006). Indeed, "[t]his is a condition precedent to *bringing an action for rescission*," and the rule "has been particularly

applied to cases where a party seeks to rescind a release." *Id.* at 801–802 (emphasis added) (citing *Leathers*, 361 S.E.2d at 845). Thus, because Plaintiff does not seek rescission and the law relied upon by Defendant arises in the fraud context, this argument is unavailing.

Defendant next asserts that because Plaintiff has not rescinded the Settlement Agreement or the B&G Release, Plaintiff has waived any right to rescission. (Doc. 49 at 10). Once again, the law relied upon by Defendant arises in the fraud context. Defendant relies solely on *Tri-State Consumer Insurance Company, Inc. v. LexisNexis Risk Solutions, Inc.*, 823 F. Supp. 2d 1306 (N.D. Ga. 2011), to make its argument, but the principles articulated in that case are readily distinguishable. In *Tri-State Consumer*, the plaintiff-insurance company executed a "master agreement" and a "software and services schedule" with the defendant-software provider. 823 F. Supp. 2d at 1313. In these agreements, the defendant agreed, among other things, to develop, deliver, integrate, and implement certain software for the plaintiff, but it subsequently failed repeatedly to deliver the promised portions of the software in accordance with the schedule. *Id.* When the defendant did deliver those portions of the software, they contained many errors. *Id.* The plaintiff's subsequent lawsuit against the defendant included several claims, including breach of contract, breach of the implied covenant of good faith and fair dealing, and—significantly—fraud. *Id.* at 1314. The defendant moved to dismiss the plaintiff's claims. *Id.*

In addressing the plaintiff's fraud claims, the court highlighted that the plaintiff's failure to plead rescission barred its fraud claims. *Id.* at 1321. The court emphasized that a party who alleges fraudulent inducement into a contract must either "(1) affirm the contract and sue in contract or (2) rescind the contract and sue in tort." *Id.* In this context, the court explained that "[a] claim for breach of contract unaccompanied by a claim for rescission is an affirmation of the contract." *Id.* Because the plaintiff had not sufficiently pleaded rescission, the court held that the

complaint affirmed the contract and constituted an election of remedies and a waiver of any rescission claim. *Id.*

Defendant relies on this quoted language to argue that Plaintiff has waived its right to claim rescission of the B&G Release because the Complaint lacks any request for rescission of the B&G Release or the Settlement Agreement. However, unlike *Tri-State Consumer*, Plaintiff does not bring any fraud claims against Defendant. Plaintiff's cursory description of Defendant's "acts of unfair competition" as "fraudulent" in Count II serves as the only explicit mention of fraud in the Complaint. (Doc. 1 ¶94).

Indeed, a review of Georgia caselaw emphasizes that this rescission rule arises in the fraud context. *See*, *e.g.*, *Weinstock v. Novare Group, Inc.*, 710 S.E.2d 150, 154 (Ga. Ct. App. 2011); *Megel v. Donaldson*, 654 S.E.2d 656, 661 (Ga. Ct. App. 2007). For example, in *Weinstock v. Novare Group, Inc.*, on which the *Tri-State Consumer* court relied, the plaintiffs alleged that the defendant, who marketed and sold condominiums to the plaintiffs, schemed to sell and advertise the condominiums as possessing spectacular city views while intending to construct a building to block those views. 710 S.E.2d at 351. The plaintiffs brought several claims against the defendant, including fraud in the inducement. *Id.* Upon appeal, the plaintiffs argued that the trial court erred in finding that they affirmed the contract by failing to seek rescission in the original complaint. *Id.* at 354. The Georgia Court of Appeals explained: "In general, a party alleging fraudulent inducement to enter a contract has two options: (1) affirm the contract and sue for damages from the fraud or breach; or (2) promptly rescind the contract and sue in tort for fraud." *Id.* In this context, the court explained that a claim for damages unaccompanied by a claim for rescission generally operates as an election to affirm the underlying contract." *Id.* (collecting cases). The court ultimately affirmed the trial court's entry of summary judgment, finding that the plaintiffs'

later attempt to assert a claim for rescission by amending the complaint was too late because the original complaint had affirmed the contracts. *Id.* at 356. Thus, because this rescission principle arises in the fraud context and Plaintiff did not bring a fraud claim, Defendant's argument regarding rescission is unpersuasive.[12]

## IV.    CONCLUSION

While the B&G Release and Covenant Not to Sue appear to bar Counts I through V (and Count VI to the limited extent recognized herein), the Court declines to enter judgment on the claims because Plaintiff's ability to rely on the terms of the Settlement Agreement is tied to the breach of contract claim, for which there remain disputed facts. Defendant may renew its challenge to these claims on the basis of the B&G Release and the Covenant Not to Sue contemporaneously with a challenge to the breach of contract claim on summary judgment.

Accordingly, it is **ORDERED**:

1.    Defendant's Motion for Partial Judgment on the Pleadings, (Doc. 49), is **DENIED**.

**DONE AND ORDERED** in Tampa, Florida on March 26, 2020.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any

---

[12] Because the Court will deny the Motion, the Court declines to address Plaintiff's brief argument that equity requires the Court to deny the Motion. (Doc. 52 at 10–11; 58 at 5).